IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT E. MORRIS, | ) |
| Plaintiff, | ) |
| | ) No. 17-cv-05939 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| GHALIAH OBAISI, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Morris fell while playing basketball at Stateville Correctional Center ("Stateville"). The resulting injuries exacerbated Morris's preexisting back condition, causing acute pain in his right shoulder, hip, and knee. Morris claims that his injuries were not treated properly by Stateville medical staff, specifically, Dr. Evaristo Aguinaldo, who attended to Morris on the day of his injury, and Dr. Saleh Obaisi, who treated him several weeks later. As a result, Morris has sued Dr. Aguinaldo and Dr. Obaisi under 42 U.S.C. § 1983, alleging that they were deliberately indifferent to his serious medical condition in violation of his Eighth Amendment rights. Now, Ghaliah Obaisi, in her role as the independent executor of Dr. Obaisi's estate, and Dr. Aguinaldo (together, "Defendants") seek summary judgment on the deliberate indifference claims. (Dkt. Nos. 143, 146.) For the reasons that follow, Defendants' motion for summary judgment is denied.

### BACKGROUND

Unless otherwise noted, the following facts taken from the parties' Local Rule 56.1 statements are undisputed. Where the facts are disputed, the Court views the facts in the light most favorable to Morris as the nonmoving party. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

Morris slipped in a puddle while playing basketball at Stateville in July 2016. (Defs.' Resp. to Pl.'s Statement of Additional Facts ("DRSAF") ¶ 1, Dkt. No. 140.) He landed on his right knee, hip, and shoulder, and immediately called for help. (*Id.*) The certified medical technician ("CMT") who responded to Morris reported that he could not stop crying. (*Id.* ¶ 4.) The CMT determined that he needed medical assistance and transported him to the Stateville hospital in a wheelchair. (*Id.*) Morris subsequently testified that the fall caused him "excruciating agony and pain." (*Id.* ¶ 1.) Prior to his fall, Morris had been diagnosed with chronic back pain, and the fall made his back pain worse. (*Id.* ¶ 2.)

While working in the hospital on the day of Morris's fall, Dr. Aguinaldo reviewed the CMT's report and indicated that he wanted to see Morris immediately. (*Id.* ¶ 4.) Morris was crying in his wheelchair when Dr. Aguinaldo first saw him. (*Id.* ¶ 5.) During that initial encounter, Dr. Aguinaldo observed that Morris reported pain when his right shoulder and knee were touched, and Morris informed Dr. Aguinaldo that he was experiencing extreme back and leg pain. (*Id.*) Just over an hour later, Dr. Aguinaldo saw Morris a second time. (*Id.* ¶ 6.) Morris still reported intense pain, and Dr. Aguinaldo assessed Morris as having trauma of the right shoulder and right knee. (*Id.*) Dr. Aguinaldo initiated the following plan of care for Morris: (1) he wrote a two-week prescription for the muscle relaxer Robaxin, to be taken twice a day in 750 mg doses; (2) he ordered an x-ray of Morris's shoulder and knee to rule out any possible fracture; (3) he referred Morris to a mental health professional to rule out an anxiety disorder; and (4) he admitted Morris to the infirmary to be observed for 23 hours, with a nurse checking Morris's vitals at eight-hour intervals. (Pl.'s Response to Defs.' Statement of Facts ("PRSF") ¶ 27, Dkt. No. 134-1.)

Notwithstanding the plan of care, however, Dr. Aguinaldo approved Morris's discharge from the hospital a mere six hours later, in Morris's view, because they needed a vacant cell for another inmate who was being sent over. (PRSF ¶¶ 27, 33.) Citing contemporaneous treatment notes, Defendants claim that Morris refused to allow a nurse to monitor his vitals; Morris, for his part, has submitted a sworn affidavit stating that he did not refuse the nurse permission to check his vitals. (*Id.* ¶¶ 22, 32.) But there is no dispute that Morris was not in the hospital for 23 hours, as Dr. Aguinaldo's plan of care dictated.

Defendants also claim that around the time of his discharge, Morris was seen by a nurse and did not voice further complaints about his pain. (*Id.* ¶ 34.) Morris does not dispute that he did not complain at that time, but he asserts that it was not his practice to repeat medical complaints that he had already made, "particularly in a setting where he believe[d] that treatment for his medical complaint [was] still continuing." (*Id.*) Defendants also note that Morris complied with the instruction to leave the hospital after six hours; Morris again does not dispute that he complied with the instruction but explains that it is not his practice to disobey direct orders from Stateville staff. (*Id.* ¶ 35.)

After his discharge, Morris submitted several grievances regarding his ongoing pain. (Statement of Additional Facts ("SAF"), July 15 Grievance, Ex. 7, Dkt. No. 134-9; July 18 Grievance, Ex. 8, Dkt. No. 134-10; August 25 Grievance, Ex. 16, Dkt. No. 134-18.) His second grievance notes that, three days after his slip, he limped while walking. (DRSAF ¶ 13.) The injury affected Morris's day-to-day life in Stateville in a number of ways; most notably, his pain was made worse by going up or down stairs, walking, and climbing in and out of the top bunk. (*Id.* ¶ 12.) As a result, it was difficult for Morris to go to the cafeteria to eat lunch and dinner, go outside to get fresh air, or visit the law library. (*Id.*) Those locations were between 120 feet and

3

1,540 feet from Morris's cell and required him to go up and down as many as 58 stairs. (*Id.* ¶ 19.) Defendants do not dispute those distances but instead contend that Morris's complaints only appear in grievances and were never communicated to any medical provider. (*Id.*) Morris further states that the same pain—with the same effects on his life—continued past August 2016, with Defendants again claiming that there is no record that he communicated his complaints of pain to a medical provider. (*Id.* ¶¶ 17–18.)

Dr. Obaisi treated Morris about five weeks after his fall. (*Id.* ¶ 15.) Dr. Obaisi prescribed Neurontin and Robaxin, although the parties dispute whether his prescription of Neurontin was a new one (as Morris contends) or a renewal (as Defendants contend). (PRSF ¶ 46.) Morris states that he had taken Neurontin in the past for a different purpose: to treat pain related to a gunshot wound to his head. (DRSAF ¶ 23.) On two other occasions in the past—before the injury at issue—Dr. Obaisi had provided Morris with similar prescriptions for either or both Robaxin and Neurontin for Morris's chronic back pain. (*Id.* ¶ 20.) Morris states that the appointment with Dr. Obaisi lasted three minutes and did not involve a physical examination, which Defendants flatly deny. (*Id.* ¶ 16.) Defendants also dispute Morris's contention, supported by his affidavit, that Dr. Obaisi declined to order an MRI and behaved belligerently towards Morris. (*Id.*)

Dr. Aguinaldo had also assessed Morris's chronic back pain in February 2016—over five months before the injury at issue. (*Id.* ¶ 21.) It was his opinion that if mild to moderate pain were unresolved after 90 days, it would be "necessary to change the treatment plan." (*Id.* ¶ 22 (internal quotation marks omitted).)

In addition to the factual record summarized above, the parties have also offered testimony from expert witnesses. Morris's expert, Dr. L. Matthew Schwartz, M.D., is a medical doctor certified in physical medicine and rehabilitation and pain medicine. (*Id.* ¶ 23; PRSF ¶ 6.)

4

Defendants' expert, Dr. Chad Prodromos, M.D., is a board-certified orthopedic surgeon. (PRSF ¶ 7.)

According to Dr. Prodromos, Morris suffered an acute self-limiting injury—in other words, a wear-and-tear injury that heals on its own with no need for other intervention. (*Id.* ¶¶ 60–61.) Once fracture, infection, and tumors are ruled out as possible causes, the goal of treatment shifts to keeping the patient comfortable until their injury self-heals.[1] (*Id.* ¶ 62.) In Dr. Prodromos's view, the scope of Dr. Aguinaldo's examination was a matter of medical judgment. (*Id.* ¶ 63.) Once an x-ray revealed no fractures, it was clear to Dr. Prodromos that Robaxin and Neurontin were adequate palliative treatments. (*Id.* ¶¶ 65–66.) In his opinion, Dr. Aguinaldo and Dr. Obaisi's treatment complied with applicable standards of care, did not cause Morris further harm, and aligned with what he would have done had he been the treating physician. (*Id.* ¶¶ 67–71.)

Dr. Schwartz disagrees with Dr. Prodromos's conclusions. In Dr. Schwartz's opinion, Dr. Aguinaldo's and Dr. Obaisi's treatment "lacked interest, curiosity, and motivation." (DRSAF ¶ 25 (internal quotation marks omitted).) In particular, Dr. Schwartz lists a number of possible

---

[1] Morris disputes the facts in Defendants' Local Rule 56.1 statement derived from Dr. Prodromos's expert report. But the disputes are generally of the type best sorted out through cross-examination—for example, whether Dr. Prodromos accurately represents the treatments (PRSF ¶ 67), whether his conclusions as to standard of care are correct (*id.* ¶ 68), and his degree of his knowledge of Morris's specific situation (*id.* ¶¶ 65–66). Morris also challenges Dr. Prodromos's opinion by pointing out that he did not personally examine Morris. (Morris Resp. at 15–16, Dkt. No. 134.) The Court is mindful of the fact that Dr. Prodromos did not personally inspect Morris, but to the extent that Morris seeks to exclude his opinion on that basis, such exclusion is not warranted. Both experts are qualified, both offer opinions from the same or similar bodies of fact, and both can assist the trier of fact. Morris's concerns speak more to the context surrounding Dr. Prodromos's conclusions. As such, they are concerns that go to weight to be given his testimony rather than its admissibility. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) ("Whether [the expert witness] selected the best data set to use, however, is a question for the jury, not the judge. Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility.")

diagnoses that should have been considered even after x-rays determined there were no fractures. (SAF, Ex. 1 ("Schwarz Report") at 1, Dkt. No. 134-3.) He criticizes what he describes as the decision to focus care on prescribing medications that Morris had already been prescribed but at potentially slightly higher dosages. (*Id.* at 7.) All this led to a "fail[ure] to meet the standard of care expected of an internist with basic competence." (*Id.*)

## DISCUSSION

At the summary judgment stage, the Court must determine if a genuine dispute of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (internal quotation marks omitted). The Court's function at summary judgment is to "determine whether there is a genuine issue for trial," not to make determinations of truth or weigh evidence. *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087 (7th Cir. 2018). Accordingly, courts must avoid "the siren song that tempts [them] into making factual determinations at the summary judgment stage." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021). Once a properly supported motion for summary judgment is made, the opposing party must respond by setting forth specific facts showing that there is a genuine factual issue for trial. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). In deciding whether there is a genuine issue, the Court must "construe all facts and reasonable inferences" in the light most favorable to the nonmovant. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017).

In this case, Morris claims that Dr. Aguinaldo and Dr. Obaisi acted with deliberate indifference to Morris's serious medical needs in violation of his rights under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference claims consist

of two components—one objective and one subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component."). To satisfy the objective component, the medical need must be "objectively, sufficiently serious." *Farmer*, 511 U.S. at 834. For the subjective component, Morris must show that Dr. Aguinaldo and Dr. Obaisi "acted with a 'sufficiently culpable state of mind,'" and that they were each "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834, 837). The subjective component can be described as having two requirements: first, that a defendant had actual knowledge of the objectively serious medical need, *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015), and second, that the defendant "realizes that a substantial risk of harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). To prevail, Defendants must show that there is no genuine issue of material fact regarding either of those elements.

### I. Objectively Serious Medical Condition

"A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653. Morris need not have been "in 'pain or extreme distress' to prove that his medical condition was sufficiently serious." *Arbuckle v. Wilcox*, No. 20 CV 1419, 2021 WL 5321552, at *7 (N.D. Ill. Nov. 16, 2021) (quoting *Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2005)). And a wide range of conditions can qualify, "including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit." *Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011). The Court looks for "the presence of a medical condition that significantly affects an individual's daily activities[]

7

or the existence of chronic and substantial pain." *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) (internal quotation marks omitted).

Defendants argue that Morris did not have an objectively serious medical need because x-rays did not reveal fractures or other structural issues, and Dr. Aguinaldo's and Dr. Obaisi's physical examinations found no visible signs of injury. To Defendants, the only evidence of a serious medical need is Morris's own complaints, which they argue are insufficient. Defendants further contend that Morris's injuries were merely self-limiting and would heal on their own.

Morris's x-rays may have been negative for fractures or other structural concerns. But Dr. Aguinaldo nonetheless devised a treatment plan for Morris when he first saw him, only to deviate from that treatment plan six hours later when he discharged Morris, apparently because the hospital was out of beds and a new patient was incoming. (SAF, Ex. 4, Dkt. No. 134-6.) Dr. Obaisi also devised a treatment plan. At his initial visit, where Dr. Aguinaldo attended to Morris, Morris cried uncontrollably both on the basketball court and in the hospital. A lay person who watched an person slip, fall, and cry uncontrollably would likely "perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653. And Morris's pain lingered, as he states that he raised the issue of muscle spasms at his later appointment with Dr. Obaisi. *Gray*, 826 F.3d at 1006. Indeed, Morris attests that his injuries caused him to limp and affected his daily life. *Id.* Defendants' argument boils down to the proposition that a serious medical condition must be an ***extreme*** medical condition—one that risks death or disfigurement. But that is not the law. A reasonable juror could find that Morris suffered from an objectively serious medical need and so summary judgment is not warranted on that basis.

## II. Deliberate Indifference

The subjective component of a deliberate indifference claim requires a plaintiff to "provide evidence that an official ***actually*** knew of and disregarded a substantial risk of harm."

*Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). The Court looks first to whether Dr. Aguinaldo or Dr. Obaisi actually knew there was a risk of harm, and second to whether, with that knowledge, they nonetheless disregarded the risk of harm.

        A.        Knowledge

Morris can show knowledge on Dr. Aguinaldo's and Dr. Obaisi's parts either by direct evidence, such as testimony that they were aware he had a serious condition, or through "evidence from which a reasonable juror could infer a doctor knew he was providing deficient treatment." *Petties*, 836 F.3d at 726.

The Court first considers Morris's initial appointment with Dr. Aguinaldo. Defendants argue that Dr. Aguinaldo lacked subjective notice because Morris's injury would heal on its own, and because Morris refused to allow a nurse to check his vitals in the hospital and left after six hours. Presumably, the latter argument is intended to suggest that the injury did not appear to be serious to Morris's treaters. But Morris disputes that he refused to have his vitals taken. (PRSF ¶ 32.) And Defendants have not presented evidence sufficient to establish as a matter of law that Morris was discharged from the hospital because he was in good condition; to the contrary, a reasonable factfinder could conclude that Morris was discharged because the hospital was full, someone else was coming, and Dr. Aguinaldo wanted to clear a bed. Defendants might prefer that the Court infer from the fact that Morris left the hospital before 23 hours had elapsed that his injury was not serious. But at the summary judgment stage, the Court draws all reasonable inferences in the nonmovant's favor.

Likewise, a reasonable factfinder could conclude that Morris did not present much resistance to being told to leave the hospital because, as Morris claims, it was not his practice to repeat the same medical complaint in a single hospital visit or to disobey direct orders. Moreover, Dr. Aguinaldo ordered a course of treatment, and there is no indication that he did so

9

purely to make Morris more comfortable; rather, it would be reasonable to infer that he ordered x-rays, prescribed medication, and ordered 23 hours of observation because he was aware Morris was suffering from a serious condition. Dr. Aguinaldo was also aware of a possibility that greater allowances—such as a lay-in permit or other permits to allow for more efficacious recovery—were required. (DRSAF ¶¶ 8–9.) It may be true that, as Defendants point out, Dr. Aguinaldo said that a lack of permits or crutches after the hospital *could* delay healing. But that only supports Morris's point: Dr. Aguinaldo was aware that this was not a minor scrape. A reasonable juror could conclude, given that Dr. Aguinaldo ordered a course of treatment and given Morris's description of and visceral reaction to his pain, that Dr. Aguinaldo was subjectively aware of Morris's serious medical condition.

The Court next considers Morris's subsequent appointment with Dr. Obaisi—roughly five weeks after the incident. Like Dr. Aguinaldo, Dr. Obaisi was aware of Morris's chronic back pain and had treated him for it previously. At his appointment, Morris told Dr. Obaisi he remained in pain and agony weeks after his injury and that he experienced muscle spasms. A reasonable jury could find that this is precisely the type of condition that would have affected Morris's daily life and points to chronic pain. *See Gray*, 826 F.3d at 1006. A reasonable jury could further find that, given that it had been several weeks and Morris still was experiencing symptoms, it should have been clear to Dr. Obaisi that even if this was a self-healing injury, more needed to be done to facilitate the self-healing. Indeed, Dr. Obaisi prescribed the same painkillers that he had previously prescribed for Morris's chronic back pain. Defendants argue that Dr. Obaisi only wrote a prescription for Morris for palliative care and that Morris's generalized, subjective complaints cannot be traced to the basketball injury. But that is an issue for the jury to decide. And a reasonable juror could find that a patient who complained of severe

pain and muscle spasms on the right side of his body, a few weeks after experiencing acute injuries to the right side of his body that went largely untreated, was experiencing ongoing symptoms from that injury that indicated a serious medical need.

In sum, Defendants have not established there is no genuine issue of material fact as to whether either Dr. Aguinaldo or Dr. Obasis was subjectively aware of Morris's serious medical need. Accordingly, summary judgment cannot be granted on that ground either.

### B. Indifference

Defendants also have not established that there is no evidence from which a reasonable juror could infer that the doctors knew they provided Morris with deficient treatment. *Petties*, 836 F.3d at 726. "[N]egligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense." *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008). Direct evidence is not necessary. *Pettie*, 836 F.3d at 726 (holding that a doctor could be liable "even if [he] denies knowing that he was exposing a plaintiff to a substantial risk of serious harm"). Indirect evidence that creates a jury question "might include" clear risk from a particular course of treatment, doggedly pursuing a course of treatment known to be ineffective, or "proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016). The finder of fact is also entitled to weigh a denial that a doctor knew his treatment decisions would cause harm against "certain clues that the doctor ***did*** know," including "evidence that the patient repeatedly complained of enduring pain with no modifications in care[ and] inexplicable delays or departures from common medical standards." *Petties*, 836 F.3d at 731 (emphasis in original).

11

On this point, Defendants offer three arguments in support of summary judgment. First, they rely on their expert's opinion that he would have provided the same or similar care as Dr. Aguinaldo and Dr. Obaisi provided. Second, they argue that Morris's argument that Dr. Aguinaldo and Dr. Obaisi were deliberately indifferent to his condition constitutes a mere difference of opinion as to the proper standard of care. And third, they argue that there is no evidence that Defendants did anything other than help Morris. None of these arguments entitle Defendants to judgment in their favor as a matter of law.

With respect to Defendants' first argument, that their expert testified he would have treated Morris the same as Dr. Aguinaldo and Dr. Obaisi, simply retaining an expert who states that he would have done the same as the treating physicians, without more, is not sufficient to eliminate any issue of material fact. This is particular so where, as here, the plaintiff has retained his own expert who is prepared to testify to the contrary. Indeed, Morris's expert has opined that there were a number of conditions that both doctors failed to rule out. And he goes even further, stating that "an internist with basic competence who carried out even the limited examinations that Dr. Aguinaldo and Dr. Obaisi respectively performed would not have believed that the therapeutic interventions implemented by each doctor were adequate." (Schwartz Report at 7.) The Court does not make determinations as to which expert's opinion is more credible in deciding summary judgment. *Godinez v. City of Chicago*, No. 16-cv-07344, 2019 WL 5597190, at *2 (N.D. Ill. Oct. 30, 2019). Rather, such direct conflict between competing expert opinions presents a classic jury issue that precludes determination at the summary judgment stage, where the Court must draw all reasonable inferences in Morris's favor.

Defendants next argue that this case boils down to a dispute in medical judgment and, as such, cannot support a finding of deliberate indifference. Indeed, the Eighth Amendment does

12

not entitle a prisoner to "the best care possible" but rather to "reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A dispute over "a matter for medical judgment . . . just isn't enough." *Murphy v. Wexford Health Sources, Inc.*, 962 F.3d 911, 916 (7th Cir. 2020) (internal quotation marks omitted). But given Morris's evidence that the decision to discharge him from the hospital after just six hours—rather than 23 hours—had to do with the non-medical decision to open up a bed rather than a judgment on his level of recovery, he has created a genuine issue of material fact as to whether Dr. Aguinaldo exercised medical judgment at all in discharging him from the hospital. *See Petties*, 836 F.3d at 733 ("[I]t would be reasonable to infer that [a doctor] made other medical decisions . . . that were dictated by cost, administrative convenience, or both, rather than medical judgment.").

Similarly, there is evidence that Dr. Aguinaldo did not follow the standard treatment protocols set out by Wexford Health Sources, Inc. ("Wexford"), the health care contractor that serves the Illinois Department of Corrections, including Stateville, and employed Dr. Aguinaldo and Dr. Obaisi. While Defendants argue that the preface to Wexfords's protocols include a disclaimer that it is not a required course of care, evidence that a doctor "fail[ed] to follow an existing protocol" can support an inference of deliberate indifference. *Petties*, 836 F.3d at 729 (involving a doctor who followed some, but not all, of Wexford's protocol). Here, a number of treatments listed in the protocol—"ice and a sling or shoulder immobilizer" for Morris's shoulder and "ice, elevation, and crutches" for his knee—were not prescribed. (*See* Morris Resp. at 10.) Given the divergence from the Wexford protocols, a jury could plausibly "infer[] that the doctor knew better than to pursue the course of treatment that he did." *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019).

There is also a dispute over what occurred at Morris's appointment with Dr. Obaisi. Morris claims that the appointment lasted three minutes, during which time Dr. Obaisi did not leave his chair and was dismissive of Morris's complaints. Defendants, in turn, argue that Dr. Obaisi's notes from the appointment reflect that he tested Morris's vitals (from which Defendants infer that Dr. Obaisi left his chair) and dispute whether Morris requested an MRI or complained of pain from a poorly healing torn muscle. "Construing the facts in [Morris's] favor, a reasonable jury could believe [Morris's] testimony over [Defendants'] insistence on the completeness of [Dr. Obaisi's] notes." *Wilson*, 932 F.3d at 520. Again, it is not the role of the Court to weigh the believability of testimony (or a doctor's notes), regardless of the parties' relative station.

Moreover, both Dr. Aguinaldo and Dr. Obaisi acknowledged that Morris suffered from ongoing, chronic back pain. *See Gray*, 826 F.3d at 1006. And at his appointment with Dr. Obaisi, Morris reported muscle spasms in the same part of his body where Dr. Obaisi knew Morris had chronic pain and where he had experienced an acute injury several weeks before. An acute injury that affects the same body part would seem to call out for a change in treatment. So would, as Dr. Aguinaldo testified, even mild-to-moderate pain that does not resolve on its own after ninety days. (DRSAF ¶ 22.) Yet Dr. Obaisi had first noted Morris's chronic back pain nearly ten months before their August 2016 appointment—on November 3, 2015—and Dr. Aguinaldo first noted it in February, five months before the incident. (*Id.* ¶¶ 20–21.) Dr. Aguinaldo's treatment plan in February involved x-rays and exercise (albeit without any instruction as to what type of exercise would be proper), and Dr. Obaisi's treatment plan in August involved a prescription for Robaxin. (*Id.* ¶ 20; SAF, Ex. 3, Aguinaldo Dep. at 66:3–67:12, Dkt. No. 134-5.) So five months (for Dr. Aguinaldo) and ten months (for Dr. Obaisi) after their initial treatment plans, with an

acute injury that left Morris in agony in the interim, both Dr. Aguinaldo and Dr. Obaisi developed nearly identical treatment plans as they had before. "State-of-mind evidence sufficient to create a jury question might include . . . the defendant's persistence in a course of treatment known to be ineffective." *Whiting*, 839 F.3d at 663. Accordingly, Defendants' motion for summary judgment is denied.

### III. Punitive Damages

Finally, Defendants argue that in the event the Court denies their motion for summary judgment as to the merits of Morris's claims, it should nonetheless find that punitive damages are not warranted as a matter of law. Defendants contend that summary judgment as to the propriety of punitive damages is warranted for two reasons: first, because there is no evidence in the record of the Defendants' "evil motive or intent" (Defs.' Mot. at 15, Dkt. No. 127-4); and second, because Dr. Obaisi is deceased.

Punitive damages serve three purposes: deterrence as to the particular defendant, also known as specific deterrence; deterrence as to the broader group of state actors who could end up in the same position, also known as general deterrence; and punishment of "the defendant for his outrageous conduct." *Smith v. Wade*, 461 U.S. 30, 54 (1983); *see also Zavala v. Obaisi*, Case No. 17-cv-03042, 2021 WL 1172774, at *12 (N.D. Ill. Mar. 29, 2021). A jury may award punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (internal quotation marks omitted). Here, because there is a genuine dispute as to whether Defendants were deliberately indifferent towards Morris, there is also a genuine dispute as to whether a jury could find that they were sufficiently reckless or callous to require punitive damages. Therefore, to the extent

that Defendants seek summary judgment on Dr. Aguinaldo's behalf as to punitive damages, their request is denied.

But Defendants' motion is granted as to Dr. Obaisi, who died in December 2017. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 957 (7th Cir. 2019). Yes, Dr. Obaisi may have exhibited sufficient recklessness or carelessness that would otherwise warrant punitive damages. That said, two of the three purposes of punitive damages—specific deterrence and punishment—are not served by their imposition against a defendant's estate. *See Zavala*, 2021 WL 1172774, at *12 (collecting cases that "reason[] that imposing punitive damages on deceased defendants would not serve two of the three purposes of punitive damages"). Other courts have reasoned that "[w]hatever incremental deterrence value imposing punitive damages on deceased defendants would have on others does not outweigh the fact that two of the major purposes for imposing punitive damages would not be served at all." *Kahlily v. Francis*, No. 08-cv-1515, 2008 WL 5244596, at *6 (N.D. Ill. Dec. 16, 2008). While this Court does not believe that always to be the case—certainly not as a matter of law—Morris's argument supporting punitive damages against Dr. Obaisi in this particular case is unavailing. If Dr. Obaisi were the sole Defendant, the question would be more complicated. But as it stands, the function of general deterrence can be achieved, if warranted, by awarding punitive damages against Dr. Aguinaldo. *See Crawford v. Aguinaldo*, No. 18-cv-4882, 2022 WL 4601135, at *11 (N.D. Ill. Sept. 30, 2022) ("Here the deceased defendant's estate will still face claims that carry compensatory damages, and the availability of punitive damages against the living defendants serves the deterrent purpose.").

As the *Zavala* court pointed out, the cases upon which Morris relies in support of punitive damages against Dr. Obaisi emanate from a Seventh Circuit decision holding that loss-of-life

16

damages are available against a decedent's estate. *Zavala*, 2021 WL 1172774, at *13 (citing *Graham v. Sauk Prairie Comm'n*, 915 F.2d 1085, 1104 (7th Cir. 1990)). But loss-of-life damages materially differ from punitive damages in that the latter are intended to punish a defendant, not to compensate a plaintiff. *Id.* Thus, in *Graham*, two of three policy goals were served by loss-of-life damages against the estate—general deterrence and compensation, but not specific deterrence—whereas here, only general deterrence would arguably be served. *See id.*

Again, the Court does not conclude that, as a matter of law, punitive damages are never warranted against a decedent's estate; rather, under the specific circumstances of this case, they are not warranted. Defendants' motion for summary judgment on punitive damages is granted as to Dr. Obaisi and denied as to Dr. Aguinaldo.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Dkt. Nos. 143, 146) is granted in part and denied in part. The motion is granted as to Morris's request for punitive damages against Dr. Obaisi's estate. Defendants' motion is otherwise denied.

ENTERED:

Dated: March 31, 2023

Andrea R. Wood
United States District Judge